Here are the next case on the calendar, Roy v. Buffalo Philharmonic and the Musicians Association of Buffalo. Good morning, your honors. The court, Linda Lally Stark, I'm here for Diane Tiveron of my office. We represent Pierre Roy. Mr. Roy is present in the courtroom today. I'd note. Your honors, it's our position that the arbitrator's award in this matter should be vacated. Mr. Roy was employed by the Buffalo Philharmonic Orchestra for 15 years prior to his termination. It's our position that the arbitrator exceeded his authority in this matter. Although he put forth a long and thoughtful decision, he based his decision on two things in particular that we take umbrage with. He not only violated the master contract between the appellant and the BPO. But he also referenced the settlement agreement that had been reached in a prior labor dispute with Mr. Roy. The terms of that settlement agreement allowed Mr. Roy to be reinstated. And it explicitly said that the terms in this agreement will not form the basis of any future litigation, any grievance, any action whatsoever. That was ignored and the very, very first paragraph of the arbitrator's decision, he references the prior termination. And then at the end, he devotes four entire pages to the June 2010 incidents. Those had no relevance to this arbitration. Mr. Roy was reinstated in January of 2011 for the spring 2011 performances. And I believe his first rehearsal was January 24th, 2011. Those issues, what happened in 11 and 12, were what were before the arbitrator. And he did consider the prior actions, and as I said, devoted four whole pages. And on page- It wasn't just those prior actions, though, that he considered, right? Correct, Your Honor. He did consider and went verbatim through the incidents that happened in 11 and 12. But our feeling is that he should not have used the prior incidents as a starting point. And he clearly said, the prior incidents are essential for an understanding and evaluation of the second termination. That it was contrary to the first settlement agreement reached by my client. Further, the arbitrator violated the master contract as master agreement, because it clearly states that incompetence or musicianship should not be a factor in arbitration proceeding. And- Incompetence or musicianship or just incompetence? I believe it said both, Your Honor. It's in Article 20G, I believe, that it does not speak to musical competence or performance. You're not contending that the arbitrator reached his decision on the grounds of musical incompetence? No, he didn't, Your Honor. But he did consider, the converse is also true. If incompetence is not supposed to be considered musical competence, the converse would also be true. Musical competence should not be considered. And most of the allegations were- Incompetence, this was impertinence. I mean, the basis wasn't, it wasn't whether he was a skilled musician or not. That was not the issue. It's not whether he was incompetent. It was whether he was performing as he should. Well, yes, Your Honor. That is how it was viewed by the arbitrator. But I'd note Ms. Villetta's- In the language of the, on A341, this article shall not be invoked for non-renewal matters based upon alleged musical incompetence. That's what it says. Correct. The very first letter that, the March 2012 letter that Joanne Fuletta sent to Mr. Roy, her very opening line, speaks to his musicality. Dear Pierre, it is with a great deal of sadness that I feel compelled to write you, to you concerning your musical performance. And I think his performance, his musicality, was always at the heart of this arbitration. And instead, it should have been his conduct. The conduct was very trivial, very trite complaints by other members of the BPO. Wasn't the Fuletta meeting only one of many, I think there were some nine, as many as nine players who testified as to your client's purposeful underplaying, supposedly, aggression, anger? Well, the arbitrator's estimation was that there were nine people. There were also many witnesses who testified that they never saw any of this conduct occur. You understand the standard for an arbitrator's award, the standard to vacate such an award because of error is extremely difficult to meet. Conflicts in testimony, the arbitrator resolves the conflicts. Conflicts in testimony aren't enough. We understand that, Your Honor. We understand that it's a very high standard in order to vacate. But in this case, we believe he exceeded his authority by violating the master agreement, by considering the prior settlement agreement, which states on its face that it should not be factored into. The third problem we found was that this really was a he said, she said. When Ms. Fuletta was concerned about the beyond the ink remark, she took it to say that Mr. Roy said he would not play beyond the ink. And Mr. Roy's, in our position, as he said, he always plays above and beyond the ink. That's a he said, she said. There was recording in notes that Mr. Roy had made of that meeting. Yet, when the opportunity came to introduce those into evidence, the arbitrator did not admit them. He reserved on it. He reserved on it, and then the offer was withdrawn. Isn't that right? I'm not sure if it was technically withdrawn. I believe it was never offered again. And what the union did at that point was try to get the information in through the witness. But those, that tape recording and his notes, which were contemporaneous with the meeting, which would have been very probative, were not ever admitted. So we feel that the arbitrator- But they weren't re-offered. I don't believe they were, Your Honor. And was the arbitrator asked to reach a decision? From my understanding, what occurred that no, that he was not, it was not re-offered into evidence. You contend that the union acted in bad faith when it sought the deposit of the $15,000. Can you point to any specific actions that the union took or did not take after your client said he wouldn't contribute the $15,000? That would lead the arbitrator to make an erroneous decision. Well, Your Honor, in addition to asking, we think that is a manifestation of bad faith. Requesting their client, who they were exclusively to represent, for payment. But in addition- You have to also, I think, show that it contributed to the arbitrator's making an erroneous decision. The request for the $15,000? When he refused, when he asked for the $15,000, when the union asked for the $15,000, he said no. Correct, our client. Your client said no, and you are saying that that was in bad faith, and that request. And my question is, what specific actions did the union take or not take as a consequence of not getting the $15,000, which can be said to have led the arbitrator to make an erroneous decision? Well, we feel the representation could have been much more zealous, that they could have tried to exclude the evidence that concerned the events in 2010 and the concert in 2010. There was no effort by the union to exclude that evidence. What went through their mind, I cannot say if it had anything to do with- Whether those were tactical decisions or not. Correct, but they did not object to the musical competency testimony, because that was off hand in hand with the BPO's position that he wasn't playing to the best of his ability. I mean, it's very hard to separate the two, and that was a consideration. And therefore, Carte Blanche, we feel there should be a new arbitration without any consideration of the 2010 incidents. Thank you. Thank you. May it please the court, Scott Horton for Buffalo Philharmonic Orchestra Society. Your review of the district court's decision is de novo, but the review of the arbitrator's decision is not, in light of the long established federal policy favoring deference to the arbitration process, where the parties to an arbitration agreement agreed to go through that procedure. Especially and including in the labor context which pertains here. Here there was an agreement, a collective bargaining agreement between the Buffalo Philharmonic Orchestra and the musicians union that represents its professional musicians in the orchestra. That agreement included an arbitration provision. It also separately included other procedures including a non-renewal provision which were not invoked here and did not pertain. The argument based on the admission of evidence regarding musicianship is entirely based on language from that separate non-renewal provision. And both the union and the BPO readily agree that that had no bearing in this case and no relevance. Certainly the discussion of Mr. Roy's musicianship was necessary to explain the facts related to his misconduct and inappropriate behavior in this case. It was not a matter of whether he would or would not be invited back the following season based on some decline in performance overall. Rather a specific argument and allegation that he was both playing deliberately poorly and being aggressive towards fellow orchestra members and management. To gain standing in this case, Mr. Roy had to challenge not only the arbitration award, but also the union's representation of him. Important to note that there was a 15 day arbitration hearing spread over the course of more than a year, which was followed by a 113 page brief being submitted on behalf of the union. And ultimately the arbitrator issued a 48 page single spaced decision upholding the termination of Mr. Roy's employment with the BPO. None of Mr. Roy's attacks on the arbitration process warrant the extreme remedy of upsetting that award. The union did not breach its duty in representing him over those 15 days and with a 100 plus page brief arguing many things in his favor and seeking that he be reinstated. The fact that it was the arbitration outcome and the arbitrator's decision that he not be reinstated is beyond this court discretion to overturn. Mr. Roy would have to show specific and very extreme violations of the arbitrator's authority to achieve that outcome. In addition to the musicianship piece, which I've already addressed, he contested in his papers the submission of transcripts and or recordings regarding meetings with members of management. As we explained in our papers, the arbitrator left open the possibility that that evidence would come in. But in the discussion of whether or not it would come in at the time it was first introduced, it was explained both by the union's counsel that there were some aspects of the evidence that may not have been favorable. And by the BPO counsel that there would be other testimony from the people who were present in those meetings that could pertain to the issues that were relevant to the case. And ultimately, the arbitrator noted in his decision the limited respect to which he felt that those conversations had any relevance. And there's nothing that could have been demonstrated differently with respect to the limited issue that the arbitrator relied on. That the music director of the BPO had concerns about Mr. Roy's deliberately not playing properly around that time frame. The arbitrator acknowledged that the BPO didn't give Mr. Roy a chance to address some of the problems it had identified when they first came to the attention of the BPO. Isn't that correct? That's correct. We don't agree with that aspect of the decision, but we don't contest that it was outside of the arbitrator's authority to make those comments. And reaching his ultimate decision, which was premised on the authority granted to him by the party's collective bargaining agreement. Your adversary this morning focuses on the union's failure to more zealously try to limit evidence coming before the arbitrator with regard to the 2010 incidents, the pre-2011 conduct. Yes, Your Honor, respectfully, I don't believe that's been in their papers to date, and I was surprised to hear that argument this morning. But again, there's- Have it now. There's myriad tactical reasons, I'm sure, why the union may have allowed that evidence to come in. And they were certainly trying to present a full picture of Mr. Roy and arguing in his behalf as evidence through their briefs, so that's about the extent I can address that at this point. So, I would just conclude in saying that the district court properly recognized that the arbitrator had exercised his authority within his discretion. And accordingly, the decision appealed from should be affirmed. Thank you. Thank you. Good morning, Your Honors. May it please the court. My name is Kathy Creighton. I'm the attorney for the Musicians Association of Buffalo, New York, Local 92. Mr. Roy was, as been said before, a principal oboist for the Buffalo Philharmonic Orchestra, and I think there's no dispute that he was a very talented musician. He was terminated in 2010, and at that time, the union went to work to represent him and got him his position back with the BPO in January of 2011. From January of 2011 until 2012, he continued to have issues that were similar to the issues from 2010's discharge. And he was discharged by the employer again. Mr. Roy contends that the union breached its duty of fair representation. As this court knows from more than 50 years of precedent, the law is well established that a union violates its duty of fair representation only if its behavior is arbitrary, discriminatory, or in bad faith. And the courts have said that the union's actions have to be so far outside the wide range of reasonableness as to be completely irrational. And in this case, obviously, I think the record shows the union's actions on behalf of Mr. Roy were not irrational. They depleted essentially all of their resources into attempting to get Mr. Roy reinstated to his position. The union spent 15 days of hearing and wrote a very extensive over 100 page post hearing brief on behalf of Mr. Roy. And Mr. Roy was present throughout the arbitration and testified in his defense. Mr. Roy alleges that the union breached its duty of fair representation by failing to object to evidence on musical performance. The arbitrator allowed in that evidence because this was not a case whether Mr. Roy was performing as a musician with regard just to his performance, but whether he was musically sabotaging is what the employer contended. Whether he was engaged in misconduct, and was he using his music performing abilities to sabotage the orchestra. And- Your adversary contends in part that the union's counsel should have been more aggressive, more assertive with respect to the recordings and transcripts that he sought to admit. Yes. Have admitted, and that- In a 12B6 motion, your honor, what we can allege is, and I'll say first, legally, that that's a tactical error that the union made in not attempting to reintroduce that. And tactical errors and strategy errors by the union are not grounds to make a proper claim of a duty of fair representation violation. I can say that there were authentication issues with the recording. There was poor quality of the recording, and also that the recording didn't necessarily show Mr. Roy in a favorable light. So the union made the decision not to reintroduce those tapes. Also, as Judge Teleska said very aptly in his decision, that was whether or not they were introduced really had no bearing on the finality of what the arbitrator decided. Because he found that whatever was in the recording also appeared in numerous, there were also many other instances of misconduct that the employer proved to the satisfaction of the arbitrator. Some of the other issues, it was also alleged that Mr. Roy, by Mr. Roy, that the union failed to address the corruption of witnesses. I think what he's referring to is he's saying that maybe there was a perjury of certain witnesses. We never, we cross-examined the witnesses. We were never able to determine that they actually perjured themselves. And again, the union did produce witnesses for Mr. Roy and cross-examined witnesses that the employer produced. And that is not a sufficient claim to make an allegation of a duty of fair representation violation. And finally, with regard to bad faith, Mr. Roy contends that the union acted in bad faith in asking him to help pay for the defense of the arbitration. And when he declined to do that, the union continued representing him throughout. The arbitrator, of course, had no knowledge that the union asked him for that aid and had no bearing on the arbitration decision. And finally, if the claim, as Mr. Roy had to acknowledge when he amended his petition, if the claim against the union fails for breach of duty of fair representation, then the claim that the arbitration award should be overturned also fails. Thank you. Thank you. Just very briefly, I did want to touch upon one other aspect. There is a public policy factor here. Mr. Roy engages in a very unique profession. There are very limited employment opportunities. Here, termination was reached by the arbitrator and in his long decision, it's clear that he was weighing issues and he came to the conclusion that reinstatement would just be too difficult. Well, the difficult, the problem goes back to the fact that the Philharmonic did not pursue any proactive measures to have everyone be in a cohesive orchestra and be in a cohesive work environment. They completely dropped the ball on that, and then for the arbitrator, two years later, to come and say, well, reinstatement really wouldn't work here because there's too much animosity among the players. It was kind of begging the question, so we feel that the termination was extreme. The arbitrator did recognize that, and that's why he awarded Mr. Roy a year's salary and money for health insurance. There are no other questions. Thank you. Thank you for your arguments. The court will reserve decision. The final three cases, USV Ray, Howell versus Montefiore Medical Center, Graham versus Macy's are on submission. The clerk will adjourn the court.